No. 32,065

B. A. McMullen, *Appellee,* v. C. D. Jennings, *Appellant.*

(41 P. 2d 753)

Opinion filed March 9, 1935.

*A. C. Malloy, Roy C. Davis, Warren H. White* and *Frank S. Hodge,* all of Hutchinson, for the appellant.

*J. N. Tincher* and *Clyde Raleigh,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action to recover damages arising from the maintenance of a nuisance.

Although the facts of this case warranted the furnishing of a map or plan sufficient to aid the court in visualizing the scene and the relation of events to locality, under subdivision (e) of rule 6 of this court, none has been supplied, but from the abstracts we learn the following undisputed facts: In the eastern part of the city of Hutchinson is a block of ground fronting on Second street. Facing north on this street is a row of nineteen houses, and plaintiff is the owner of the next to the last one at the east end. To the east of this block the main line of the Chicago, Rock Island & Pacific Railway Company runs in a north-and-south direction. Plaintiff purchased his lot and built his house about twenty years ago. He then sold it and, after being away three or four years, repurchased it in 1924. In 1928 defendant purchased land south of the row of houses and erected an elevator having sixteen upright cylindrical concrete

storage tubes or bins arranged in a double row, the tubes being about 100 feet high. On the top of these tubes was erected a frame gallery about nine feet high and fourteen feet wide, and at the west end was built a headhouse to contain machinery for elevating grain and for distributing it to the various tubes. In the latter part of 1929 and the early part of 1930 an additional twelve tubes were constructed to the east, and later in 1930 twelve more tubes were constructed to the west. The galleries were extended to cover the new tubes. The original headhouse was of temporary construction and was replaced in June, 1930, by a permanent one in the same location. Switches from the railroad have been built on both the north and south sides of the rows of tubes, one of the switches on the north side running within a few feet of the rear of plaintiff's premises. Plaintiff's lot is improved with a one-story, five-room house, a double garage, and has grass and shrubbery growing thereon. Plaintiff's house is about 500 feet from the headhouse on the elevator.

Plaintiff's petition was filed in November, 1932, and alleged his ownership of the real property and the construction by the defendant and the laying of the railroad tracks; that defendant has and now unloads large numbers of cars of grain, and cleans and stores it in the elevator and loads it into cars, and said acts have created a most offensive, obnoxious kind of dust, which, with smoke from the trains, has tainted and corrupted the air in and about plaintiff's premises so as to render the dwelling house and premises unhealthy and unfit for occupation. It is further alleged the trains and large engines used in handling the grain have caused such noise and vibration as to render the premises valueless as a home; that in the treatment of grain obnoxious smelling chemicals have been used to plaintiff's injury, and in the operation of the elevator dust has been permitted to escape; that it is obnoxious, sickening and offensive, and filters into plaintiff's home and causes damage to the personal effects and furniture therein, and that all such acts have reduced the value of his home in the amount of $2,500, for which he prayed.

Defendant's answer admitted plaintiff's residence and defendant's erection of the elevator, denied the various claims of nuisance or that he had damaged plaintiff, and alleged that his elevator was located on a switch of the above railroad in the industrial district of Hutchinson where it was permitted by ordinance to operate; that the first part of the elevator was erected in 1928 and commenced

operation about January 1, 1929, and at all times since had been operated in a careful and orderly manner, with particular attention to the rights of adjacent owners, and without unnecessary annoyance or discomfort to them; that the main line of the railroad was a short distance to the east and had been there for years. The statute of limitations, providing a limitation of two years for bringing actions for damages to real or personal property, was pleaded.

Plaintiff, testifying in his own behalf, stated the elevator was in operation in 1929 and before; that after the headhouse was built, four switch tracks were built south of him (between his property and the elevator); switch engines would run in with bells ringing and smoke rolling out of them, cars would stand there and hoboes would sleep in them, and that was when the depreciation started; that one track came within seven feet of the corner of his lot; that since the building of the bins or tubes there is suction; that he has continuously had trouble with dust; it gets in the attic and through the shingles, rots the lumber, causes a terrible smell when it gets wet; that he complained to defendant right at the start, and when defendant started to build the second section plaintiff talked with defendant, who said when they got it completed there wouldn't be any dust, but there was just as much dust afterwards as before. He further stated that in the winter the headhouse cuts off the sunshine from his place after 2:30 in the afternoon. Other witnesses for plaintiff testified there had been dust there ever since the elevator was in operation; that dirt had been scooped out of the elevator from the top to the ground; that the dust would settle on plaintiff's property; that it had an odor or stench similar to a pig pen. One witness stated he believed there was more dust after the new headhouse was completed than before, because the whole construction was larger; that he had seen better precautions to prevent escape of dust, and did not see any dust collector when he was in the elevator. Another witness stated he had lived near since 1928 and that the dust came out wherever there was an opening, and that when the first headhouse was there, a greater part of the time you could hardly see it for the dust, and that he and others complained to defendant both before and after the new headhouse was built. Other witnesses testified that the erection of the new headhouse didn't get rid of the escaping dust; one said the amount of dust increased as more bins were added, another that it stayed about the same. There was testimony also as to the noisome

quality of the dust, as well as to the effect upon living conditions. We need not here notice the testimony as to the effect upon the value of plaintiff's property.

Defendant demurred to plaintiff's evidence on the ground no cause of action was proved, on the further ground it was not affirmatively shown that the operation of the elevator constituted a nuisance or a negligent or improper use of the property, and for the further reason, that if any cause of action existed it accrued more than two years before the filing of the suit. This demurrer was overruled, the trial proceeded, and judgment against the defendant followed. Defendant appeals, assigning various errors, two of which will be noticed.

. Did the evidence show that a nuisance existed? It is argued by appellant that his business is a lawful one, located in a community where like businesses are being carried on, operated in a nonnegligent manner, and that such annoyances as plaintiff suffers are not sufficient to warrant recovery. It is said that one is entitled to use his own property in any lawful manner he may choose, and as a general statement that may be conceded, but his use must be such that it does not materially and unnecessarily interfere with the right of an adjoining property owner to have enjoyment of his premises. Likewise, there is a distinction to be made whether the claimed nuisance arises from some use by processes brought into being on the premises or from a development of the natural resources thereon. In the case here we have a situation where the nuisance, if any, arises from the erection and operation of the elevator, and not from the development of any natural resources on the premises. Assuming a nuisance exists, the remedies are to enjoin the further continuance or to have damages for the unlawful use. The question, primarily, is not one of negligence, although negligent use may convert a lawful into an unlawful use, but is whether or not a nuisance exists. Without repeating the evidence, it was shown that the elevator was so operated that large quantities of fine dust were permitted to escape, in some instances being deliberately dumped out of the elevator, all in such manner that the operator must have known that it would settle upon the property of an adjoining owner to his damage.

In Harper on Torts it is said:

"But while the doctrine of ancient lights and the easement of air over adjoining lands is repudiated, it is a nuisance to unreasonably pollute the air

with soot or smoke, dust, foul odors, gases, and other annoying and offensive substances to the damage of adjoining land occupiers in the use and enjoyment of their property. The annoyance by pollution of the air must be material and substantial to be unreasonable, and where, for example, dust caused by the operation of a business or industry is only occasional and the harm or annoyance slight, it will not be held a nuisance. If, in view of all the circumstances of the case, including the character of the community, the location of the property, the social interest in the activities complained of, the extent and nature of the harm to the plaintiff, the pollution of the air is not unreasonable, there is no nuisance although there may be some casual damage to adjoining property holders. In determining whether the harm to the plaintiff is unreasonable, the annoyance is measured by what would unreasonably disturb the ordinary and usual comforts of persons of normal sensibilities. 'It is not sufficient,' it is said, 'that it be considered a nuisance by those persons of very delicate and fastidious tastes or sensibilities; it must be of such a character as to be a nuisance to those persons of average mental and physical conditions, and those of normal sensibilities and tastes.' " (§ 185, p. 383.)

In *Phillips v. Brick Co.*, 72 Kan. 643, 644, 82 Pac. 787, where the court found the facts did not warrant relief to the plaintiff, it was said:

"Whether the use was unreasonable and the inconvenience and injury serious and substantial, or only slight and trivial, were the questions submitted to the trial court for determination. As bearing on the questions involved, see *Fogarty v. Pressed Brick Co.*, 50 Kan. 478, 31 Pac. 1052, 18 L. R. A. 756; *Railway Co. v. Armstrong*, 71 Kan. 366, 80 Pac. 978, and cases there cited." (p. 644.)

In *Stotler v. Rochelle*, 83 Kan. 86, 109 Pac. 788, a hospital for treatment of cancer was alleged to be a nuisance. In that case a review is made of what constitutes a nuisance. A permanent injunction against maintenance of the hospital was held to be proper.

In *Gilbert v. Construction Co.*, 110 Kan. 298, 203 Pac. 1113, the syllabus recites:

"The setting up and operating of a rock crusher in the street within forty-three feet of plaintiff's residence and the consequent throwing of large quantities of dust upon and into the residence, injuring and destroying furniture, clothing and food, was a nuisance." (Syl. ¶ 1.)

And in *King v. American Rock Crusher*, 119 Kan. 618, 240 Pac. 394, where some of our decisions are reviewed, injunction was allowed against a nuisance.

The subject is likewise treated in 20 R. C. L. 438, *et seq.*, and 46 C. J. 653, *et seq.*, to which reference is made. And in 3 A. L. R. 312 and 11 A. L. R. 1401 will be found annotations on "Dust as Nuisance." In so far as permitting the dust to escape and annoy the

adjacent owners is concerned, we are of opinion that there was sufficient evidence that the demurrer was properly overruled. It may be remarked here that the noise accompanying the switching of cars, the vibrations of the earth from the movements of engines, nor smoke from the engines, can hardly be said to be nuisances for which defendant is responsible, particularly in view of the proximity to the main line of the railroad. Neither does the fact that erection of the improvement cut off some of plaintiff's light constitute a nuisance. (See *Shepler v. Kansas Milling Co.*, 128 Kan. 554, 278 Pac. 757, and cases cited.)

When did the cause of action accrue, and is it barred by the statute of limitations?

The question as to when a cause of action accrues and whether the nuisance complained of is permanent or recurring has resulted in a diversity of conclusions. An exhaustive annotation on "Character of nuisance as continuing; when cause of action arises; successive actions" will be found in L. R. A. 1916E 997 *et seq.*, and the matter is also treated in 37 C. J. 883, 46 C. J. 802, 17 R. C. L. 716, 20 R. C. L. 465.

It is generally held the first right of action for injuries caused by a nuisance or a continuing tort arises when the first injury is inflicted. Although in many particulars the same principles apply to trespass and nuisance, there is this difference: in trespass the mere breaking and entering gives rise to a cause of action; in nuisance, the plaintiff is not disturbed in the enjoyment of his property until the act of the defendants has resulted in some injury. If the action be in trespass there is but one cause of action; if in nuisance it becomes important to determine whether the facts warrant but one action or a succession of actions as the various injuries may be inflicted. While perhaps not conclusive, in determining when the cause of action arose in the instant case, considerable weight should be given not only to the allegations of the petition but to the evidence offered in support. In *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679, damages were sought for injury to pasture lands by pollution of a stream, and it was said:

"The nature of a cause of action and the time when it accrues are determined by the facts, and not by when the injured person chooses to sue, or what he chooses to sue for." (See cases cited.) (p. 757.)

What has hereinbefore been stated with reference to the allegations of the petition and to the evidence will not be repeated. One allegation of the petition is:

"That the defendant for more than two years last past has been, and now is, in possession of certain premises contiguous to the said premises of the plaintiff herein, and within a distance of approximately twenty feet therefrom; and that the said defendant has erected upon said premises about two years ago a grain elevator and laid railroad tracks on said premises; and that within the last two years he has erected additions thereto,"

followed by allegations that the use of the premises thereafter constituted a nuisance. The last paragraph of the petition is:

"That the plaintiff has suffered and still suffers a special and peculiar injury resulting from said acts of the defendant; and that said acts have reduced the *value of his home* in the sum of $2,500, making his said home unfit for habitation for himself and his family, all to the great damage of the plaintiff."

No special questions were submitted to the jury to bring out what particular testimony may have been relied on by it in arriving at its verdict but, having found for the plaintiff, conclusions must be resolved in plaintiff's favor. Unless the pleadings and evidence disclose a situation which absolutely precludes judgment in his favor, we must conclude that the jury found such facts that the cause of action arose within the statutory period. It was made to appear by plaintiff's evidence that from the inception of operation of the elevator in 1929 it was so operated as to constitute a nuisance, and that he so complained to defendant before the second headhouse was built. He argues, however, that whatever may have been the case before, when the new headhouse was built in 1930 the situation became worse. The evidence, however, showed the same state of facts as to dust, smell, etc., existed prior to the last construction as afterwards, the only claim of difference being as to degree. He also testified with reference to the suction around his place following the building of the tubes, the cutting off of the sunlight, the building of four switch tracks, the smoke and noise from switch engines, and—

"Q. So you consider that the building of those tracks on the other side of his elevator running on the north side of the elevator is what caused the depreciation or damage to your house? A. Well, mostly.

"Q. Well, you are complaining more of the noise and smoke from the trains on these tracks than from the headhouse? A. Well, the whole thing in general."

And other testimony is abstracted as follows:

"I complained when he built the switch track to the north of the elevator. It came within seven feet of the corner of my lot. I figured that affected the value of my property. The building of the track and the switching of cars

back and forth made my property worthless. The dust and tracks and noise and smoke and everything and the suction around the elevator did it. By suction I mean the wind coming around the end of the elevator. The trouble I complain of about the cars, noise, smoke and trains standing there was on the tracks that were built after the headhouse was constructed. In the winter time the headhouse deprives my house of sunshine. We do not get any sun after 2:30 in the afternoon."

With respect to the damage to his property, plaintiff testified that the value of his real estate prior to the erection of the elevator in 1929 was $3,500, and its value at the time he filed suit was $800 or $1,000. Later he said that immediately before the headhouse (probably meaning the second or permanent headhouse) was built, it was worth $3,500, and that taking into consideration only damage from dust it was worth $1,400 and that, in fixing that figure, he allowed $500 on account of the general depression, and that in figuring the value of $1,400, he took into account inconvenience of the noise, the smoke of the engines on the switch track, and "the fact that the elevator is erected there near my place and has been erected since 1929 and in operation since that time."

It thus appears that while the petition might be construed to state a cause of action for damages from injuries incurred within two years, the evidence showed facts which could have no application except to injuries incurred at least in part between the start of operations of the elevator about January 1, 1929, and November 16, 1930, which was two years before the petition was filed. It likewise appears that in so far as damages to the real estate are concerned, plaintiff did not seek to recover loss of use of his property during the last two years, but did seek recovery for all acts which injured his property and in the nature of permanent damages.

While situations may arise where it can be said that successive causes of action arise, and because the conditions are such that while they may be annoying they are not sufficient to constitute nuisance, here we have a situation that at the time the petition was filed and at the time of the trial was no different, except perhaps in degree, than it was shortly after the time the elevator started operation in 1929, and this is determinable from the plaintiff's individual testimony. In fact, he did not testify to the contrary. Not only did he testify as to the facts, but he stated he complained to the defendant before the permanent headhouse was built, and also shortly thereafter. This headhouse was built about six months before the

period of the statute began to run measured against the time the suit was brought.

In *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899, 50 L. R. A., n. s., 388, it was charged that in 1905 the city constructed a system of sewers which discharged into a creek which, prior thereto, was a stream of wholesome water suitable for live stock and for domestic purposes, and that in the same year an oil company discharged waste matter and refuse into the creek, and that as a result the usefulness of the creek to the plaintiff was destroyed and his premises damaged; that until 1909 the discharge and flood waters did not permit settling on plaintiff's property, but that dry weather diminished the flow, and the sewage and waste and refuse made the creek into a cesspool and a nuisance. The question as to when a cause of action arose and when it is barred was disposed of in the following language:

"The principal question presented in this appeal is whether or not the cause of action on which a recovery was had was barred by the statute of limitations. The plaintiff, as we have seen, did not sue for a temporary injury or for any special damage or loss which he had sustained immediately before the bringing of the action, but he treated the injury as a permanent one and as a sort of an appropriation of an interest in his property, and asked for all damages already sustained and which he might sustain in the future. He could have elected to have sued for temporary damages, sustained within the statutory period preceding the bringing of the action, and for any subsequent injury or loss an additional action might have been brought. He chose, however, to treat the injury as permanent in character and brought a single action to recover for all present and prospective damages to his land. As the sewer system constructed by the city and the refinery constructed by the oil company were permanent in their nature, and as the flow of the sewage and refuse from them was designed to continue indefinitely in the future a cause of action for permanent damages arose when the sewage and other impurities were first emptied into the stream. As the effect of the discharge of the sewage and the refuse in the stream could have been ascertained with reasonable certainty and as the stream was polluted to a certain extent when the discharges were thrown into the stream plaintiff could have brought an action for permanent damages at the beginning, and it is settled that 'whenever one person may sue another a cause of action has accrued and the statute begins to run.' (25 Cyc. 1066.) The plaintiff chose a remedy for permanent injury and is bound by the limitations which the law places upon the enforcement of such remedy." (p. 43.)

And see the cases cited therein.

Space forbids a full statement of facts, but in *Parker v. City of Atchison*, 58 Kan. 29, 48 Pac. 631, the city bridged an alley and made improvements along a creek bank to safeguard the bridge.

Suit was brought to enjoin claimed obstruction of the creek and to abate the claimed nuisance. In concluding its opinion this court said:

"It would seem from the testimony that the mere improvement of the alley could not have operated as a very serious injury to the property of the plaintiffs in error; but assuming that it was injured to some extent, they were too late in claiming a recovery. As the improvement is permanent in its character, but one action could be maintained in which all damages, present or prospective, would be recoverable. The action accrued in 1884, when the structure was completed and . . . it was barred at the end of two years." (p. 39.)

In *Pever v. Railway Co.*, 100 Kan. 266, 164 Pac. 159, it was held:

"The action was one for damages for injury to a tract of 140 acres of land, caused by enlargement, through operation of the forces of nature, of a ditch rightfully and properly dug by the railway company on its right of way to drain its roadbed. The ditch had deprived the plaintiff of the use of three and one quarter acres of land adjoining the right of way. Damages were claimed for this injury, and for depreciation in the market value of the entire tract occasioned by the ditch. *Held,* a cause of action accrued when the ditch invaded the plaintiff's land, damages for permanent injury were then recoverable if desired, and the action was barred because not commenced within two years after the cause of action accrued." (Syl.)

In *Thomas v. Woodman*, 23 Kan. 217, in connection with a mill, a dam was built in 1874. It washed out three times and was rebuilt, twice after 1876. The plaintiff owned lands below the dam. In 1878 he filed suit to enjoin, claiming nuisance in that the dam caused sand bars to form, the water became sluggish, grass grew in the river and rotted and became offensive. In disposing of the matter this court said:

"Further, the conclusion of the court, set forth in the findings of law, to the effect that the defendant in error was not guilty of unreasonable delay in bringing his suit, is not sustained by the findings of fact. By these findings it appears that, in the summer of 1876, he knew the full consequences to his premises of the diversion of the water from the Little Arkansas river, and in the fall of that year visited and walked across the dam. Thereafter he could not plead ignorance of the real facts in the case. Yet he permitted the dam in the river to be twice rebuilt to the same height, after the fall of 1876, and made no serious objection. He waited till March, 1878, to commence any legal opposition, and therefore, in our opinion, has been guilty of improper delay in applying to the court for equitable interference in his behalf." (p. 227.)

And to the same effect are *Mosby v. Manhattan Oil Co.*, 134 Kan. 732, 8 P. 2d 325, as well as many cases cited in those above mentioned.

Appellee argues that the erection of the elevators did not constitute a nuisance, and that is true as to those matters which we hold to be nuisance, *i. e.*, damages from dust and disagreeable odors thereof. There was no nuisance sufficient to constitute a cause of action until the dust and dirt seriously and substantially interfered with his use and enjoyment of his home. A somewhat analogous contention was made in *Beard v. Kansas City*, 96 Kan. 102, 150 Pac. 540, wherein many cases in support of that theory are cited. And a more recent case is *Buss v. Missouri Pac. Rld. Co.*, 120 Kan. 689, 244 Pac. 1059.

It must be noted, however, that in the first line of cases mentioned the action is for recovery of permanent damages to the real estate, while in the last line the action is for recovery of damages other than permanent damages to the real estate arising when the trespass occurred or the nuisance started.

It is true in the instant case that the erection of the elevator and accompanying structures did not constitute a trespass or a nuisance. The plaintiff's own testimony, however, is that the nuisance started with the operation of the elevator and has continued since, varying only in degree as the operations covered the enlarged plant, and the testimony with respect to damages to the real estate is not limited to matters arising within two years, but covers matters arising not only from operation of the elevator, for which he might recover, but other matters, such as loss of light, noise from the railroad and such things, for which he could not in any circumstance recover from the defendant. It seems clear to us that plaintiff sought recovery of damages from the defendant on account of matters which existed since shortly after the elevator started operation; that such cause of action accrued prior to two years before the petition was filed, and was barred by the two-year statute of limitations applicable (R. S. 60-306, *Third*), and that the trial court erred in not sustaining the defendant's demurrer for that reason.

The judgment of the trial court is set aside, and the cause remanded with instructions to sustain the defendant's demurrer to plaintiff's evidence.