. No. 36,866

Randall McComb, *Appellant*, v. The Stanolind Oil and Gas
Company and The Pure Oil Company, *Appellees*, Marguerite L.
Garden, *Defendant*.

(186 P. 2d 574)

Opin-
ion filed November 17, 1947.

*Roy C. Davis,* of Hutchinson, argued the cause, and *Frank S. Hodge, Eugene A. White* and *Robert Y. Jones,* all of Hutchinson, were with him on the briefs for the appellant.

*George Stallwitz,* of Wichita, argued the cause, and *Joseph G. Carey, W. F. Lilleston, George C. Spradling* and *H. V. Gott,* all of Wichita, were with him on the briefs for appellee Stanolind Oil and Gas Company.

*Glenn Porter,* of Wichita, argued the cause, and *William Tinker, Getto McDonald, Arthur W. Skaer* and *Hugh P. Quinn,* all of Wichita, were with him on the briefs for appellee Pure Oil Company.

The opinion of the court was delivered by

THIELE, J.: This was an action to recover damages for pollution of a water supply on plaintiff's real estate alleged to have been caused by oil field operations of the defendants. The jury returned a general verdict in favor of plaintiff and answered special questions. On a motion for judgment *non obstante veredicto,* judgment was ultimately rendered against the plaintiff, who has appealed, the principal question submitted being whether his cause of action was barred by the statute of limitations. The defendant, Marguerite L. Garden, filed no answer and did not appear at the trial, and is not a party to the appeal. Reference to the defendants as hereafter made does not include her.

Plaintiff commenced his action on June 20, 1945, his petition, in substance, alleging that he was the owner of certain real estate in the town of Zenith in Stafford county; that the defendants were owners and operators of oil and gas leases on surrounding real estate on which there were producing oil wells; that the defendants constructed open pits, ponds and disposal pools upon their respective leases and caused to be placed therein salt water, waste crude oil, basic sediment and other deleterious matter; that the pits, ponds and pools were constructed in a sandy soil or strata which extended down to the subsurface water from which plaintiff received his water supply, and that the salt water, waste crude oil, basic sediment and other deleterious matter permitted by defendants to run into the pits, ponds and pools had seeped and penetrated through the ground to plaintiff's water supply; that the pollution of the water supply was caused by the acts of the defendants, and by reason of such wrongful acts in ruining plaintiff's water supply plaintiff had been compelled to haul water for personal use, commencing January 1, 1944, until conditions got so bad it was impossible for plaintiff to longer live on the premises and he abandoned

the real estate in September, 1944. Other allegations of specific damage need not be noted. For present purposes it may be said that each answering defendant denied generally and pleaded that any alleged cause of action of the plaintiff was barred by the two-year statute of limitations.

At the trial the defendants demurred to plaintiff's evidence for the reason that it showed his cause of action barred by the two-year statute of limitations. This demurrer was overruled and defendants presented their defense. At the conclusion of the trial on October 25, 1946, the jury returned a verdict in favor of the plaintiff against the defendants and the court rendered judgment in conformity with the verdict. The jury also answered four special questions, viz:

"1. Do you find from the evidence that the water well in question was becoming contaminated from oil field refuse at the time Mr. and Mrs. Mays lived there? A. No.

"2. Do you find that as of March 3rd and 4th, 1942, there was actually existing in the water in plaintiff's water well salt or chlorides to the extent of 128 parts per million? A. Yes.

"3. Do you find that there was a pollution of the water in plaintiff's water well? A. Yes.

"4. If you answer question No. 3 in the affirmative, then state:

"(a) When did such pollution or contamination occur? A. Early part of 1944.

"(b) When did the plaintiff know of such contamination? A. Early part of 1944."

In due time each defendant filed three motions: (1) For a new trial; (2) for judgment *non obstante veredicto* upon the answer to specials question No. 2; and (3) to strike the answers to special questions 1, 3 and 4 for the reason they were contrary to the evidence and were given under the influence of passion and prejudice. On December 21, 1946, the trial court denied the motions for a new trial, sustained the motions to set aside the answers to special questions and rendered judgment in favor of the defendants on the answer to special question No. 2 and set aside the entry of judgment of October 25, 1946. The journal entry of judgment states that the trial court found that in view of cases dealing with limitation of actions, especially *Seglem v. Skelly Oil Co.*, 145 Kan. 216, 65 P. 2d 553, and in view of the analysis of the water from plaintiff's well, made on March 3, 1942, which showed a salt content of 7.8 grains of salt to the gallon, the date of the trespass and the accrual of a cause of action was established, and the plaintiff was barred, his

suit having been filed more than two years after the limitation statute started to run.

Plaintiff perfected his appeal from various rulings and judgment of December 21, 1946.

Appellant specifies error in six particulars, but the sum and substance of his complaint as presented in his brief is that the trial court erred in ruling that his cause of action was barred by the statute of limitations (G. S. 1935, 60-306, *third*).

To determine correctness of the trial court's rulings and judgment of December 21, 1946, we must apply the law to the facts shown by the evidence, and in view of the general verdict in favor of the plaintiff, that review is confined to his evidence, except as particular matters may have been determined by the answers to special questions submitted. We also have for consideration whether the special answers are contrary to the evidence. Our review of the evidence is limited generally to matters necessary to a decision of the questions so presented.

The evidence discloses the following geographical situation. The entire town of Zenith comprises seventeen acres in the east half of the southeast quarter of the southeast quarter of section 14, township 24, range 11, in Stafford county. Plaintiff's lots lie almost in the center of the town. The oil and gas leases operated by Stanolind include the west half of section 14 and the north half of section 23 which lies immediately to the south, as well as other lands further removed. The lease operated by Pure includes all of the southeast quarter of section 14 except the southeast quarter thereof, and Garden's lease was on the west half of the southeast quarter of the southeast quarter. The water level of the water in plaintiff's well was about sixty-five feet. The chief geologist of the oil field section of the sanitary division of the state board of health testified that as nearly as he could say, the underflow was in a southeast direction. Another witness who stated he had been in the vicinity for forty years, was a well driller and had drilled many wells in and around Zenith, stated the general direction of the well water underflow was a little to the northeast, more east than north. Without attempting a detailed statement as to location there is ample evidence that the defendants had salt water ponds and pools and pits on their leases to the northwest, west, southwest and south of the town of Zenith.

Plaintiff purchased his real estate from C. A. Mays in January,

1942, and with his family moved into it in March, 1942. It is not necessary that we describe the house and other improvements. There was a well on the premises and when they moved in the water was good. Plaintiff knew that there had been some trouble with salt water in wells in Zenith, and in March, 1942, he took a sample to the DuPray Laboratories at Hutchinson, whose report showed that there was 7.5 grains of salt, computed as sodium chloride, per gallon of water. This is stated to be the same as 128 parts per million. (See special question No. 2.) At that time the family used the water, drank it and used it in every way. They had no difficulty with soap and obtained a fine suds. Various witnesses testified that they were at a dinner at the plaintiff's home on November 11, 1943, and all drank the water and it was good. In January, 1944, appellant's oldest child got sores on her mouth which a doctor thought might be caused by infection from the water. About the same time the water became discolored, soap would not make suds in it but became curdled. Corrosion became noticeable on plumbing fixtures and by June or July they turned green. In January, 1944, they ceased using the water for drinking purposes. They kept a cow which drank of the water. It freshened in January, 1944, and within a short time it was dry. In September of 1944, the water turned red when boiled. A test made by the State Board of Health under date of March 24, 1944, showed chloride content in the amount of 800 parts per million, and another under date of April 28, 1944, showed 997 parts per million. Tests by DuPray Laboratories after the action was commenced, made on November 14, 1945, and August 6 and September 13, 1946, showed, respectively, 1,110, 818, 737 parts per million. Medical testimony was to the effect that if the chloride content reaches 250 parts per million it is a hazard to use the water and if there is an increase the hazard increases accordingly. It was also shown that the U. S. Public Health Service had put that figure as the limit above which water is not satisfactory for human use. There was also testimony that some of the water wells in Zenith had become polluted and that some had not.

The question when a cause of action for damages to real estate accrues has been considered by this court on numerous occasions. Although there seems to be some contrariety in the decisions, it is to be borne in mind that each decision has been rendered upon the particular facts of that case, and when that is borne in mind some

of the difficulty disappears. In our review no effort is made to refer to each decision dealing with the subject, but we do refer to each case on the question cited by the parties, as well as to some others.

On the subject of inquiry *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899, is a leading and much-cited case. There the city had erected a sewer system and discharged sewage into a stream, and about the same time an oil company had erected a refinery and drained waste water, oils and other impurities into the same stream. When rains were abundant and the volume of water was large there was little damage to lower landowners, but when the flow of water was diminished the injurious effect was greatly increased. More than two years after construction was completed and operations started, a landowner brought an action for permanent damages. It was held that as the sewer system and refinery were permanent structures and their operation was necessarily a constant and continuous injury to plaintiff's land, his cause of action accrued when the sewage and impurities were first deposited in the stream, and that he was barred by the statute of limitations.

In *Beard v. Kansas City*, 96 Kan. 102, 150 Pac. 540, it appeared the city in 1901 had graded a street and bridged a creek so that in heavy rains water overflowed plaintiff's property. In 1910 plaintiff filed a claim, later followed by action in court, for damages sustained when large bodies of water were thrown on his premises, causing great damage. In the opinion reference is made to previous decisions, dealing with accrual of the action, and it was said that in those cases the improvements in and of themselves caused damage, but that in the case before the court the improvement caused no damage—that it was caused by overflowing water and until that occurred there was no damage, and that the action could be maintained, many cases in support being cited. We note that amount of recovery was held to be limited for a reason of no present importance.

In *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679, plaintiff's evidence showed that he noticed pollution of his water in 1925 to such an extent cattle would not drink it. His action, commenced in 1929, was held to be too late. It was said the nature of a cause of action and the time when it accrues are determined by the facts and not by when the injured person chooses to sue, or what he chooses to sue for. It was also said that when the erection of an obstruction does not of itself cause injury to the land, but subsequently causes injury by flooding the land, the cause of action

arises when the flooding occurs, but that in the case before the court the bringing in of the first oil well caused injury and the permanent nature of the injury was demonstrated more than two years before he sued.

In *McMullen v. Jennings*, 141 Kan. 420, 41 P. 2d 753, plaintiff sued for permanent damages to real estate occasioned by dust from a grain elevator. In the opinion a review was made of many of our decisions, to which reference is made. It was there held that plaintiff's evidence showed his damage started when the elevator commenced operation and varied when the size of the elevator was increased. It was said the erection of the elevator did not constitute a trespass or a nuisance, but that plaintiff's evidence disclosed the nuisance started with the operation of the elevator; that the additions to the elevator only increased the nuisance and that not having brought his action within two years from commencement of the nuisance, plaintiff was barred.

In *Gardenhire v. Sinclair-Prairie Oil Co.*, 141 Kan. 865, 44 P. 2d 280, plaintiff commenced an action for permanent damages in February, 1933. Over five years before, the defendant had drilled an oil well over one mile from plaintiff's farm, through which ran a stream of clear water and it made some provision for taking care of salt water and slush. Plaintiff knew of this construction and that the salt and slush might reach him. The wells were deepened and in March, 1931, it became manifest that plaintiff's property would be damaged. It was held that an action did not accrue to the plaintiff until he was damaged by the discharge of salt water and that his action was not barred.

In *Fulmer v. Skelly Oil Co.*, 143 Kan. 55, 53 P. 2d 825, where a review of authorities pro and con is made, it was held that where poisonous substances are permitted to escape from a pond and pollute waters so as to substantially lessen their purity and quality on land which they cross, a cause of action accrues to the owners for permanent damages when the water becomes polluted and not when subsequent drought or low water increases the pollution and resultant damages.

In *Seglem v. Skelly Oil Co.*, supra, principally relied on by the trial court in making its ruling, this court held:

"Where salt water, oil and other refuse are negligently permitted to escape from an oil field into a stream which polluted it, with consequent damage to the land through which the stream flows, the landowners' cause of action arose and the statute of limitations began to run when the pollution of the stream

began; and where such action was not begun within two years thereafter it was barred by the statute of limitations—following *McDaniel v. City of Cherryvale,* 91 Kan. 40, 136 Pac. 899, and *Fulmer v. Skelly Oil Co.,* 143 Kan. 55, 53 P. 2d 825." (Syl. ¶ 1.)

Reference is made to the opinion for a full statement but it appears that plaintiff commenced his action in September, 1934, and that the jury, answering special questions, found that beginning in 1917 the defendant had completed sixty-three wells upstream from plaintiff's land and that as each well was completed some salt water had escaped into Turkey creek and that plaintiff was aware of pollution prior to 1931, the amount thereof being affected by rainfall. The jury found that plaintiff was first damaged to a substantial degree in October, 1932. Plaintiff recovered on a general verdict and defendant appealed. In reviewing the evidence it was said that it was apparent that damage to plaintiff's farm occurred more than two years prior to the bringing of the action, and the judgment of the trial court was reversed and judgment ordered for the defendants.

Our attention is also directed to *Waidlick v. City of Manhattan,* 150 Kan. 34, 90 P. 2d 1104, where plaintiff sought to recover damages for overflow alleged to have resulted because of a city dump along the banks of a stream. The evidence there clearly disclosed that plaintiff was aware of the dump, had protested it was a menace and had suffered actual damage at least six years before she commenced her action. The trial court sustained a demurrer to her evidence, and this court affirmed. The decision is of little help in deciding the case at bar.

In each of the above decisions may be found citation of authorities and other decisions not mentioned above.

Measured by the above authorities and those referred to therein, what does the evidence disclose as to when appellant's cause of action accrued? It is clear that the drilling of the oil wells and the creation of ponds in which salt water and waste were placed did not in and of themselves invade any right of appellant or his predecessor in title nor give either any cause of action, and no situation is disclosed such as appeared in *McDaniel v. City of Cherryvale* or *McMullen v. Jennings,* supra, and like cases. Did the fact that an analysis was made in March, 1942, which disclosed that the water contained 128 parts per million of sodium chloride, give him a cause of action? It is a matter of common knowledge that well water is rarely, if ever, entirely free from mineral matter in solution. The

evidence disclosed that water containing less than 250 parts per million of chlorides is satisfactory for human use, and the test of 1942 showed the water to contain little more than half that amount; it also showed that the appellant's family from March, 1942, until January, 1944, used the water for human consumption and for domestic use, and that it was good. Two years prior to the filing of the instant action was June 20, 1943. Had appellant filed an action at any time between March, 1942, and June, 1943, alleging his water supply had been polluted, the very evidence as to the degree of pollution of the water and the use of it by appellant and his family would have shown that he had no cause of action. May it be said his cause of action accrued in March, 1942, when under the evidence he then had no cause of action? May it be said that because certain wells in Zenith had become polluted by that time that gave appellant any cause of action? Although we have not detailed the evidence, it was shown that of wells in Zenith within a comparatively short distance of each other, some have become polluted and others have not. Appellant could not have maintained an action because some nearby well had become polluted—his well had to be affected to give him any cause of action. In our judgment appellant's cause of action did not accrue until within two years prior to the filing of his petition and the trial court erred in holding his cause of action was barred by the statute of limitations.

It seems apparent the only reason the trial court set aside the answers to special questions numbers 1, 3, and 4, was because of its ruling for judgment on the answer to question No. 2. That is not a sufficient reason. The above review of the evidence makes it clear the answers returned are not contrary to the evidence and should not have been set aside. Perhaps this matter is immaterial, however. Even though the answers be set aside, the general verdict was for appellant, and unless it is disposed of through some legal means, it stands.

In addition to its brief, filed jointly with Stanolind, covering matters heretofore discussed, the Pure Oil Company has filed a supplemental brief in which it is pointed out that it served and filed a notice of appeal from the judgment of October 25, 1946, and that in view of the judgment of December 21, 1946, its appeal became moot. Appellant's abstract states such an appeal was perfected and later withdrawn. Our records disclose the appeal was never certified to this court. Pure urges that if this court should hold the trial court

erred in holding the statute of limitations had run, nevertheless the judgment in its favor is right, even though the reason for entering it may be wrong. The contention is that there is no evidence to show that operations of the company resulted in pollution of appellant's well. The company filed no cross-appeal and the matter of the sufficiency of the evidence to sustain the verdict and judgment of October 25, 1946, is not before us. Nor may it be said the judgment is right, even though the trial court used a wrong reason for entering it. The judgment of December 21, 1946, was based purely on the motion for judgment *non obstante veredicto,* and with that judgment set aside there is no judgment in favor of the Pure Oil Company, but on the contrary, when the judgment of December 21, 1946, is reversed and held for naught, the judgment of October 25, 1946, stands unchallenged.

The judgment of the trial court of December 21, 1946, is reversed as to the rulings on appellee's motions to set aside the answers to special questions, on their motions for judgment on the answer to special question No. 2, and on its judgment vacating and setting aside the judgment of October 25, 1946, in favor of the appellant, and the cause is remanded to the trial court with instructions to reinstate the judgment of October 25, 1946.

BURCH, J. (concurring specially): I cannot concur in the second syllabus and the corresponding portion of the opinion as written. The general rule is well recognized, as stated in the second syllabus, ". . . an appellee who has not given notice of cross-appeal as provided by G. S. 1945 Supp. 60-3314, may not question the sufficiency of the evidence to sustain a verdict and a judgment thereon against him." The court's opinion, in discussing a contention urged by the Pure Oil Company, reads:

"The company filed no cross-appeal and the matter of the sufficiency of the evidence to sustain the verdict and judgment of October 25, 1946, is not before us."

I agree that we should not, on the present record, consider the merits of the first judgment rendered against either of the defendant oil companies. My reason, however, for not now considering that judgment on its merits is not because such defendants failed to perfect a cross-appeal but because such judgment was vacated and set aside. Prior to the expiration of the time in which the defendants were required to perfect an appeal from the first judgment entered

against them, the trial court set aside that judgment. Therefore, the defendants, Pure Oil Company and Stanolind Oil and Gas Company, had no cause to appeal as no judgment remained entered against them and the later judgment entered by the district court as of December 21, 1946, was in favor of the companies. Manifestly, such defendants would not appeal from an order vacating a judgment which previously had been rendered against them nor would they cross-appeal from the first judgment against them after it had been vacated. All of the questions that might have been raised by such defendants on direct appeal or cross-appeal became moot because of the subsequent ruling on the part of the trial court. There was no necessity for a cross-appeal on the part of either of the defendant companies. Nevertheless, syllabus two of the court's opinion strongly intimates that the Pure Oil Company, because it has not given notice of a cross-appeal, now ". . . may not question the sufficiency of the evidence to sustain a verdict and a judgment thereon against [it]." Moreover, the court's opinion reads: "The judgment of December 21, 1946, was based purely on the motion for judgment *non obstante veredicto,* and with that judgment set aside there is no judgment in favor of the Pure Oil Company, but on the contrary, when the judgment of December 21, 1946, is reversed and held for naught, the judgment of October 25, 1946, stands unchallenged." The opinion concludes: ". . . the cause is remanded to the trial court with instructions to reinstate the judgment of October 25, 1946."

From such language the inference, at least, may arise that the judgment against the companies is to be reinstated as of October 25, 1946. If such a construction is given to the language of the opinion, it would follow that the companies can no longer appeal from such judgment because the periods in which a direct appeal therefrom or a cross-appeal could be taken have expired even though there has been no judgment against the companies since December 21, 1946, when the first judgment was set aside. If such a result might follow from the court's opinion, I would dissent therefrom. Probably such a result does not follow, but the court's opinion should clearly state that the judgment entered by the trial court as of October 25, 1946, for the purpose of appeal, if desired, should be reinstated as of the date the mandate of this court is recorded.

WEDELL and HOCH, JJ., concur in the foregoing specially concurring opinion.